**TABB LAKES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–3906L.**

United States Claims Court.

Oct. 2, 1992.

temporary taking under the fifth amendment based on the issuance of a Cease and Desist Order by the U.S. Army Corps of Engineers requiring that plaintiff suspend further construction activities until receipt of a permit from the Corps, where a court overruled the Corps' underlying jurisdictional determination.

## FACTS

The following facts are undisputed, except to the extent noted. On October 3, 1986, an anonymous caller advised the U.S. Army Corps of Engineers, Norfolk District (the "Corps"), that property owned by Tabb Lakes, Ltd. ("plaintiff"), the developer of Tabb Lakes subdivision, a planned residential community located in York County, Virginia, contained wetlands. On that date R.H. Jones, an Environmental Scientist for the Corps, made an on-site inspection of the property and determined that wetlands existed in sections 3, 4, and 5 of plaintiff's property pursuant to the Clean Water Act, 33 U.S.C. §§ 1251–1387 (1988) (the "CWA").

Richard R. Nageotte, Woodbridge, Va., for plaintiff. James Scott Krein, Nageotte, Krein & Gray, of counsel.

Dorothy R. Burakreis, Washington, D.C., with whom was Acting Asst. Atty. Gen. Barry M. Hartman, for defendant. Martin Cohen, Asst. Chief Counsel, and Dawn Phillips, Asst. Dist. Counsel, Norfolk District, U.S. Army Corps of Engineers, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on plaintiff's motion for partial summary judgment on liability and defendant's cross-motion for summary judgment. The principal issue for decision is whether plaintiff is entitled to just compensation for a

### 1. *The Cease and Desist Order*

On October 8, 1986, Mr. Jones met with and advised plaintiff that placing filling material in the affected wetland portions [1] would require a permit from the Corps. Mr. Jones believed that the Corps had jurisdiction over the property pursuant to section 404 of the CWA, "Permits for Dredged or Fill Materials," 33 U.S.C. § 1344, and Corps regulations, 33 C.F.R. §§ 323.2(a)(3) (1983),[2] 328.3(a)(3) (1987). Also on October 8, the Corps issued plaintiff an Order To Cease and Desist all further construction activities involving the discharge of filling materials. The Corps informed plaintiff that failure to comply with the order could result in civil and/or criminal penalties. It also advised plaintiff to submit a Joint Permit application pursuant to section 404 of the CWA for any additional planned fill-

---

1. Wetlands existed on approximately 38 of a total of 74 acres in sections 3, 4, and 5, encompassing 171 of 219 building lots.

2. All other citations to the Code of Federal Regulations refer to the 1987 edition.

ing.[3]

On October 10, 1986, plaintiff, believing that its property was subject to Corps jurisdiction, submitted the permit application. According to plaintiff, it would not have filed the application had it known that the Corps lacked regulatory jurisdiction over its property under section 404 of the CWA.[4]

At the time the Corps exercised jurisdiction over plaintiff's property, its Office of Counsel had not yet made a formal jurisdictional determination that plaintiff's property was legally subject to Corps jurisdiction.[5] Not until July 18, 1988, did the Corps Office of Counsel decide that plaintiff's property met the regulatory definition set forth at 33 C.F.R. § 328.3(a)(3).

On October 20, 1986, Mr. Jones and H.R. Ashe, plaintiff's Vice–President, met to discuss allowing plaintiff to continue sewer installation and road construction on portions of the affected property. Mr. Jones, by telephone on the following day, informed plaintiff that the road construction could be accomplished under a Nationwide Permit, 33 C.F.R. § 330.5(a)(1–26), but that the sewer installation would require a full Corps permit. Mr. Jones did not specify which, if any, Nationwide Permit would apply.

On October 21, 1986, Mr. Jones informed plaintiff that it could install the sewer lines as long as there was no change in existing elevation. No further roadwork, however, could continue until the Corps approved the permit application.

On November 19, 1986, the Corps informed plaintiff by letter that it would be required to prepare an environmental report as part of the application process. The Corps requested that the report address the following:

(1) a discussion of the purpose and need for plaintiff's project;

(2) an outline of the extent of filling required;

(3) a statement of the purpose and need for dredging of the proposed lake;

(4) a detailed statement of alternatives to present construction plans, including (i) construction of roads and building lots in upland lots only, thereby resulting in fewer total building lots (ii) relocation of the project to a practicable alternative, and (iii) no project at all;

(5) a statement of the adverse effects to the environment under the present plan and under alternative plans.

After receiving the letter, plaintiff retained James R. Reed & Associates, an environmental consultant, and Mel Thomas, a wetland delineation expert, to assist in preparing the environmental report.

On December 5, 1986, plaintiff met with the Corps to ascertain more precisely what information would be required in the environmental report. On January 9, 1987, plaintiff's environmental consultant submitted the requested report. The report

---

**3.** Plaintiff contends that Mr. Jones led it to believe that permit approval would take approximately 30 days after submission of the application. In addition, plaintiff states that it was not told that plaintiff would be required to submit an environmental report, that it would be required to submit mitigation plans as part of the permit application process, or that there was any question of whether the Corps had jurisdiction over the property. Mr. Jones denies that he represented to plaintiff that a Corps permit would be obtained in 30 days or that he misled plaintiff. Finally, Mr. Jones denies that he represented that the Corps could issue an After the Fact Permit for the work completed as of October 8, 1986. In fact, William H. Poore, Chief of the Corps' Regulatory Branch, informed plaintiff's environmental consultant by letter dated February 3, 1987, that all filling activities prior to October 8, 1986, would have qualified for

Nationwide Permits, 33 C.F.R. § 330.5(a)(1–26), or would not have required a Corps permit at all.

**4.** The Corps jurisdictional determination of July 18, 1988, was ultimately overruled in *Tabb Lakes, Ltd. v. United States*, 715 F.Supp. 726 (E.D.Va.1988), *aff'd*, 885 F.2d 866 (4th Cir.1989) (Table).

**5.** The Corps' practice authorized field officers, such as Mr. Jones, to decide if wetlands existed; the issue as to whether the wetlands were "waters of the United States," 33 U.S.C. § 1362(7), as defined in 33 C.F.R. § 328.3(a)(3), was to be resolved by the Corps Office of Counsel. In determining whether wetlands are "waters of the United States," a nexus between interstate or foreign commerce must exist. 33 C.F.R. § 328.-3(a)(3).

classified 38.2 acres in sections 3, 4, and 5 as "headwater wetlands."[6] Of the 38.2 acres of such wetlands, 14.2 acres would require filling materials. In contrast, the Corps' Jurisdictional Determination, dated July 18, 1988, classified plaintiff's property as containing "isolated wetlands."[7]

On February 25, 1987, William H. Poore, Chief of the Corps Regulatory Branch, sent a letter to plaintiff's environmental consultant requesting that the following additional information be included in the report:

In the project alternative section, please state how much money has been spent to date. You will also need to elaborate further on the alternative analysis of limiting development in the remaining sections. Although you do state the economic consequences of developing in upland areas only or developing only 68 lots involving filling of one acre of wetlands; however, you did not include a break even point to your proposed development. The break even point analysis should include the number of lots available, the amount of wetlands to be impacted, and a proposed development redesigned.

Plaintiff began to assemble the information requested in this letter.

On March 17, 1987, plaintiff met with Bruce Williams, Chief of the Corps Permit Section. According to plaintiff, Mr. Williams led plaintiff to believe that its Joint Permit Application would be approved in return for a 24–acre mitigation plan.[8] Mr. Williams, on the other hand, denies that he led plaintiff to believe that a 24–acre mitigation plan would be adequate. Rather, Mr. Williams states that he indicated that the Corps might accept such a plan if it could be shown that the wetlands on the site had been so modified from their

natural condition as to have been effectively drained.

On April 1, 1987, the Corps issued a Joint Federal/State Public Notice stating that the filling associated with 171 building lots on plaintiff's property would require a Corps permit. The Notice further stated that plaintiff proposed to create 24 acres of wetlands, open water, and habitat enhancement features to mitigate the adverse environmental impact associated with the filling. The Corps subjected the permit application to public notice for 30 days.

On April 28, 1987, plaintiff's environmental consultant submitted an addendum to the environmental report (the "addendum"), which reported plaintiff's break-even point to be the sale of 192 of 219 lots, with a profit of $790,035.00 after estimating the mitigation costs at $700,000.00 for the 24–acre plan. On May 12, 1987, J. Mark Carter, Director, Department of Community Development, County of York, Virginia, wrote to Mr. Poore of the Corps and indicated that the addendum was acceptable to York County. On May 13, 1987, C.C. Crowder, Director, City of Newport News, Department of Public Utilities, approved the addendum in a letter to plaintiff's Vice–President.

On May 22, 1987, plaintiff's environmental consultant submitted a revised mitigation plan that diminished the proposed mitigation plan from 24 to 21.1 acres. The report stated that there was no local opposition from property owners to this plan.

On June 11, 1987, an Interagency Joint Permit Processing meeting was held at the Corps office.[9] The Corps preliminary recommendation was to deny plaintiff's revised mitigation plan; approval, instead, would require a 1:1 mitigation proposal.[10]

---

**6.** "Headwater wetlands," 33 C.F.R. §§ 330.2(b), 330.5(26), are "adjacent waters" and the issue of a nexus to interstate or foreign commerce is irrelevant.

**7.** "Isolated wetlands" are "waters of the United States," subject to regulation pursuant to 33 C.F.R. § 328(a)(1–7).

**8.** Mitigation is a requirement of the CWA and Corps' regulations to offset wetland losses. *See*

33 U.S.C. § 1344(b); 33 C.F.R. §§ 325.4(a)(1), 325.4(a)(3).

**9.** Such meetings occur on a monthly basis and are attended by all relevant state and federal agencies that review permit applications.

**10.** Other agencies involved commented on plaintiff's plan in the following manner:
(1) Environmental Protection Agency—hold in abeyance until further review (June 15, 1987).

According to plaintiff, 1:1 mitigation would involve 14.2 acres more than the 24 acres purportedly agreed to with Mr. Williams. According to Mr. Poore, the Corps was requiring in general a minimum of 1:1 mitigation for loss of wetland functions and values as a condition for issuing a section 404(b)(1) permit.

At a meeting on June 22, 1987, the Corps informed plaintiff that its proposed mitigation plan was unsatisfactory and that additional mitigation would be required.

On July 14, 1987, plaintiff's environmental consultant wrote to the Corps requesting permission to use Nationwide Permit 26, 33 C.F.R. § 330.5(a)(26), to gain access to the upland lots. The Corps agreed to the request provided that plaintiff plug storm water drainage facilities that could flood the property.

On August 24, 1987, plaintiff, on the advise of legal counsel, sent a letter to the Corps indicating that it was withdrawing its permit application because it no longer financially could meet the Corps' request for additional mitigation. Plaintiff also asserted that it did not believe that the Corps had jurisdiction over its property under section 404 of the CWA. Finally, plaintiff notified the Corps that it would recommence work unless advised to the contrary.[11]

### 2. *The court order*

On September 21, 1987, plaintiff filed a declaratory judgment action in the United States District Court for the Eastern District of Virginia, Norfolk Division, Civ. A. No. 87–635–N. Plaintiff sought a declaration that its property was not within the purview of the Corps' regulatory authority under section 404 of the CWA.

On October 7, 1987, Brigadier General Charles E. Williams, Commander of the Corps North Atlantic Division, granted the Corps discretionary authority over all section 404 filling activities on plaintiff's property.[12] Under this authority, the Corps revoked the Nationwide Permits which would have permitted plaintiff to obtain access to its upland lots located in sections 3, 4, and 5.

In response to the Corps' exercise of discretionary authority, plaintiff sought to enjoin such action through a Petition for Injunctive Relief in federal district court. On October 28, 1987, prior to a hearing on the legality of the Corps' exercise of discretionary authority over plaintiff's property, John F. Kane, Assistant United States Attorney, confirmed in writing to plaintiff's counsel that the Government would revoke discretionary authority prior to a hearing on the matter.

On October 15, 1987, Colonel J.J. Thomas, District Engineer for the Corps, mailed a certified letter to Cowles M. Spencer, plaintiff's president, excepting three separate fills for the purpose of road construction authorized by Nationwide Permit 26, 33 C.F.R. § 330.5(a)(26), in order to allow plaintiff to obtain access to its upland lots located in sections 3, 4, and 5. Notwithstanding Colonel Thomas' and Mr. Kane's letters, the Corps did not request revocation of the previously granted discretionary authority from the North Atlantic Division until February 3, 1988. On April 25, 1988, Brigadier General Williams withdrew the previously imposed discretionary authority. Plaintiff contends that it could not develop and sell the upland lots because the withdrawal of discretionary authority still did not permit the installation of utilities in areas other than the road crossings.[13]

---

(2) United States Department of Interior, Fish and Wildlife Service—concur with Corps' recommendation (July 11, 1987).

(3) Southern Environmental Law Center—deny the permit (July 8, 1987).

**11.** At no time during the permitting process did plaintiff request that a formal jurisdictional determination be made.

**12.** The discretionary authority encompassed the entire wetlands complex both on plaintiff's property, as well as on other adjacent properties.

**13.** On July 14, 1988, plaintiff's counsel wrote to Michael Rowe, Esq., United States Department of Justice, Environmental Defense Section, concerning plaintiff's inability to develop and sell its upland lots without the necessary utility services. These services would not be provided by Virginia Electric & Power Company until such

On or about July 18, 1988, the Corps Office of Counsel issued a Jurisdictional Determination pursuant to 33 C.F.R. § 325.9. It concluded that wetlands contained within sections 3, 4, and 5 of plaintiff's property fell within the Corps definition of "waters of the United States," 33 C.F.R. § 328.3(a)(3), and therefore were subject to the regulatory jurisdiction of the Corps. The Jurisdictional Determination was forwarded to plaintiff on July 19, 1988.

On November 7, 1988, the district court overruled the Corps' Jurisdictional Determination, holding that it was procedurally defective under the Administrative Procedure Act, 5 U.S.C. § 553 (1988). *Tabb Lakes, Ltd. v. United States*, 715 F.Supp. 726 (E.D.Va.1988), *aff'd*, 885 F.2d 866 (4th Cir.1989) (Table). The judgment became final on December 19, 1989.

Although Final Subdivision Plats for sections 3, 4, and 5 were approved on January 7, 1987, York County required plaintiff to re-subdivide these sections in order to delineate upland lots and wetland lots contained within these sections. Subsections 3A, 4A, and 5A represented the upland subdivision plats; and subsections 3B, 4B, and 5B, the wetland subdivision plats. York County further required that the Corps approve plaintiff's delineation of the sections prior to permitting final recordation of the subdivision plats. After some delay the Corps approved the delineation and plaintiff recorded the Final Record Plats on the following dates: October 31, 1988, for section 5A; June 21, 1989, for section 3A; and June 29, 1989 for section 4A.

Plaintiff sold and closed 50 lots within sections 3, 4, and 5 before early December 1989, but not until after the Corps approved the re-subdivision plats and recorded them with York County.

### 3. *Plaintiff's receipts from sales of residential lots* [14]

In a letter dated March 13, 1992, plaintiff's counsel supplemented its discovery responses with a list of Tabb Lakes subdivision sales by plaintiff. Defendant's Exhibit ("DX") A reflects all of the lot sales within the entire Tabb Lakes subdivision, sections 1 through 5, from inception through 1991, including the contract and closing dates, purchaser, and price (both gross sales price and net to plaintiff).[15] The gross sales price does not include sewer tap fees which plaintiff received and reported on line 5 of its federal tax return ($41,753.00).

In addition to the facts set forth in DX A, some of the lots in Tabb Lakes subdivision were subject to one or more previous contracts for sale that never went to closing. DX A reveals:

In 1985 plaintiff closed on 78 lots in Tabb Lakes subdivision, for a total gross sales price of $1,701,100.00.

In 1986 plaintiff closed on 104 lots in Tabb Lakes subdivision, for a total gross sales price of $2,629,775.00.

In 1987 plaintiff closed on 43 lots in Tabb Lakes subdivision, for a total gross sales price of $1,189,950.00.

In 1988 plaintiff closed on 3 lots in Tabb Lakes subdivision, for a total gross sales price of $94,300.00.

---

time as permission was received from the Corps to install utility lines in the upland lots.

**14.** When the numbers presented by the parties have varied, the court has selected the more conservative figure.

Plaintiff agrees with defendant's proposed findings regarding "Plaintiff's receipts from Sale of Residential Lots" solely for the purpose of "a mathematical computation of what is shown on DX 'A' and Wagasky Exhibit 'a', a lot sales list of Tabb Lakes subdivision showing the date of contract and the date of closing of individual lots." Plf's Statement of Genuine Issues, filed June 29, 1992, ¶¶ 32–40. Plaintiff asserts as a

genuine issue that these mathematical computations, while on their face correct, have no relevance to the issues in this case.

**15.** Plaintiff did not book contracts for sales as actual sales until closing or until 75 percent of the money was received (in which case the amount subordinated would be booked as an "account receivable"). In the case of lot sales to plaintiff's partners or shareholders, the sale would be booked only after the house constructed on the lot was built and sold by the shareholder and the money received.

In 1989 plaintiff closed on 53 lots in Tabb Lakes subdivision, for a total gross sales price of $1,864,350.00.

In 1990 plaintiff closed on 39 lots in Tabb Lakes subdivision, for a total gross sales price of $1,422,900.00.

In 1991 plaintiff closed on 66 lots in Tabb Lakes subdivision, for a total gross sales price of $2,423,600.00.

The total gross sales price of Tabb Lakes subdivision lots closed on by plaintiff in 1985, 1986, 1987, 1988, 1989, 1990, and 1991 was $11,325,975.00 (excluding the sale of the model home). This sum does not include the sewer tap fees, which were in addition to the gross sales prices reported in DX A, prepared by plaintiff's bookkeeper.

DX A also reflects:

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1985 was $21,809.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1986 was $25,286.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1987 was $27,673.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1988 was $31,433.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1989 was $35,176.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1990 was $36,485.00 (rounded to the nearest dollar).

The average gross sales price at closing of a lot in Tabb Lakes subdivision in 1991 was $36,721.00 (rounded to the nearest dollar).

Average gross sales prices by year indicate that the average lot price increased every year.

DX A lists the following with respect to lot sales contracted for and closed:

In 1984 plaintiff contracted to sell and later closed on 39 lots in Tabb Lakes subdivision, for a total contract sales price of $826,600.00.

In 1985 plaintiff contracted to sell and later closed on 117 lots in Tabb Lakes subdivision, for a total contract sales price of $2,793,250.00.

In 1986 plaintiff contracted to sell and later closed on 70 lots in Tabb Lakes subdivision, for a total contract sales price of $1,193,250.00.

In 1987 plaintiff contracted to sell and later closed on 1 lots in Tabb Lakes subdivision, for a total contract sales price of $27,900.00.

In 1988 plaintiff contracted to sell and later closed on 39 lots in Tabb Lakes subdivision, for a total contract sales price of $1,369,600.00.

In 1989 plaintiff contracted to sell and later closed on 18 lots in Tabb Lakes subdivision, for a total contract sales price of $638,650.00.

In 1990 plaintiff contracted to sell and later closed on 41 lots in Tabb Lakes subdivision, for a total contract sales price of $1,495,400.00.

In 1991 plaintiff contracted to sell and later closed on 61 lots in Tabb Lakes subdivision, for a total contract sales price of $2,241,200.00.

From 1984 through 1991 plaintiff contracted to sell and closed on 386 lots in Tabb Lakes subdivision, for a total of $11,325,975.00. In addition, DX A lists contracts totalling $724,000.00 as not closed.

DX A lists the following with respect to lot sales contracted for, but never closed:

In 1988 plaintiff signed, but never closed on, contracts for 2 lots, for a total gross contract price of $68,000.00.

In 1989 plaintiff signed, but never closed on, a contract for 1 lot, for a total gross contract price of $35,500.00.

In 1990 plaintiff signed, but never closed on, a contract for 1 lot, for a total gross contract price of $39,900.00.

In 1991 plaintiff signed, but never closed on, contracts for 16 lots, for a total gross contract price of $580,600.00.

Plaintiff signed, but never closed on, contracts for 20 lots, for a total gross contract price of $724,000.00.

DX A reports the following lot sales while the Cease and Desist Order was in effect:

A total of 75 lots was contracted for sale before the Cease and Desist Order went into effect and closed on before the Cease and Desist Order was lifted, for a total gross sales price of $1,988,800.00. These sales and closings consisted of 5 in section 2A, for a gross sales price of $133,500.00, and 70 in section 2B, for a gross sales price of $1,855,300.00. Of the 70 sold in section 2B, all were contracted for sale on the same day, July 30, 1986.

A total of 54 lots was contracted for sale after the Cease and Desist Order went into effect and closed on before the Cease and Desist Order was lifted for a total gross sales price of $925,450.00. These consisted of 1 in section 2A, for a gross sales price of $27,900.00; 2 in section 3A, for a gross sales price of $70,900.00; 4 in section 4A, for a gross sales price of $144,600.00; and 47 in section 5A, for a gross sales price of $682,050.00.

No lots in sections 3B, 4B, or 5B were sold before the Cease and Desist Order was lifted, although many were sold later.

In addition, 3 lots were contracted for sale during the Cease and Desist Order and were never closed. These consisted of 1 lot in section 3A and 2 lots in section 5A.

### 4. Plaintiff's profit distributions and reported income

Plaintiff distributed a total of $1,200,000.00 to its shareholders in 1987, representing a profit distribution.

Plaintiff distributed $100,000.00 in profits to its shareholders in 1990.

Plaintiff's federal tax return for 1985 shows gross receipts/sales of $1,570,-684.00; total income (line 9) of $515,218.00; and ordinary income (line 24) of $153,-480.00.

Plaintiff's federal tax return for 1986 shows gross receipts/sales of $3,144,-301.00; total income (line 9) of $1,547,-407.00; and ordinary income (line 24) of $1,064,570.00.

Plaintiff's federal tax return for 1987 shows gross receipts/sales of $1,415,-625.00; total income (line 6) of $862,114.00; and ordinary income (line 21) of $667,-814.00.

Plaintiff's federal tax return for 1988 shows gross receipts/sales of $66,781.00; total income (line 6) of $16,891.00; and ordinary loss (line 21) of $76,574.00.

Plaintiff's federal tax return for 1989 shows gross receipts/sales of $1,873,850.00 total income (line 6) of $725,222.00; and ordinary income (line 21) of $591,889.00.

Plaintiff's federal tax return for 1990 shows gross receipts/sales of $1,345,-050.00; total income (line 6) of $449,658.00; and ordinary income (line 21) of $205,-472.00.

### 5. Commingled financing and development of plaintiff's residential/commercial properties

#### a. Common financing

On April 6, 1984, plaintiff closed on its purchase of approximately 170 contiguous acres of land in Poquoson, Virginia, for residential and commercial development. In 1985 plaintiff closed on the purchase of the C.L. Taylor property and the Evans property. Plaintiff asserts the purchase of the contiguous 170 acres was solely for the purpose of the residential development of the Tabb Lakes subdivision and that the 2.574 acres zoned "General Commercial," purchased from Sovran Bank, N.A., Trustee for Pela R. Hundley, was purchased only for the purpose of providing an access road between Tabb Lakes subdivision and Route 17.

Plaintiff did not maintain separate checking accounts for its residential and commercial properties. Plaintiff disputes the

relevance of this fact, because neither generally accepted accounting principles nor accounting for the purposes of federal income tax reporting establishes a requirement for separate bank checking accounts.

Plaintiff did not file separate federal income tax returns for its residential and commercial properties. Plaintiff argues, however, that this fact is not relevant because federal income tax laws and regulations do not allow an individual taxpayer to file separate income tax returns based on different classifications or zoning of real property owned by that taxpayer.

### b. *Purchase of lots by plaintiff*

Out of the 100 lots comprising section 3 of the Tabb Lakes subdivision, 64 were closed on, 12 of which were purchased by either "Tabb Lakes," "Tabb Lakes, Ltd.," or "Tabb Homes Inc." All of these purchases by plaintiff occurred after the Cease and Desist Order was lifted.

Out of the 50 lots comprising section 4 of the Tabb Lakes subdivision, 41 were closed on, 5 of which were purchased by either "Tabb Lakes," "Tabb Lakes, Ltd.," or "Tabb Homes Inc." One of these 5 purchases, the purchase of lot number 219, occurred before the Cease and Desist Order was lifted. It closed on September 21, 1989. The other purchases by plaintiff took place after the Cease and Desist Order was lifted.

Out of the 75 lots comprising section 5 of the Tabb Lakes subdivision, 72 were closed on, 16 of which were purchased by either "Tabb Lakes," "Tabb Lakes, Ltd.," or "Tabb Homes Inc." Ten of these 16 purchases occurred before the Cease and Desist Order was lifted, the purchase of lots numbered 188, 364, 366, 389, 396, 398, 400, 401, 428, and 438. Plaintiff's other purchases took place after the Cease and Desist Order was lifted.

The final record plat for Tabb Lakes subdivision section 3A was recorded on June 21, 1989, and plaintiff then was permitted to develop and sell the 21 upland lots located within the original section 3 of the subdivision. Defendant argues that while the recordation date was June 21, 1989, whether or not that act gave plaintiff

permission to develop and sell the 50 lots is a legal conclusion.

The final record plat for Tabb Lakes subdivision section 4A was recorded on June 29, 1989, after which plaintiff was permitted to develop and sell the 10 upland lots located within the original section 4 of the subdivision. Defendant argues that while the recordation date was June 29, 1989, whether or not that act gave plaintiff permission to develop and sell the 50 lots is a legal conclusion.

The final record plat for Tabb Lakes subdivision section 5A was recorded on October 31, 1988, and thereafter plaintiff was permitted to develop and sell the 50 upland lots located within the original section 5 of the subdivision. Defendant argues that while the recordation date was October 31, 1988, whether or not that act gave plaintiff permission to develop and sell the 50 lots is a legal conclusion.

Plaintiff contends that because of the Cease and Desist Order, none of the land located in sections 3, 4, or 5, including the uplands, could be platted, developed or sold, because the Corps would not permit plaintiff access to roads and utilities that had to pass through the wetlands to the uplands. Defendant denies this assertion, contending that, as of October 15, 1987, the Corps advised plaintiff's president that plaintiff was allowed to make three separate fills for the purposes of road construction under Nationwide Permit 26 at Gardenville Drive, Heather Haven, and the intersection of Thomas Hundley Drive and Bridge Road Drive. Defendant further asserts that a July 14, 1988 letter from plaintiff's counsel to the Corps refers to "upland lots currently being developed by my client" and indicates that at least by July 12, 1988, road crossings had been constructed to rough grade except for the one at Ridge Road and Thomas Hundley. The letter also notes that clearing had begun in order to install utilities and that certain sewers had been installed. A Corps file memo indicates that as of a site visit on June 30, 1988, sewer taps to the individual lots had been placed and the main sewer line had been installed.

According to plaintiff, after the Cease and Desist Order issued, York County required Corps approval before the plats for the upland lots could be approved. Defendant denies this assertion and points to Exhibit P of the Affidavit of Louis M. Penci, dated May 27, 1992, which indicates that the county requested information, not approval from the Corps, as to its position on any wetland areas within sections 3A, 4A, or 5A and final plats for those sections. Defendant also relies on a letter of October 14, 1988, from York County indicating that it would proceed to approve the plat subject to certain modifications and would assume that the Corps had no objection unless it indicated otherwise by October 21, 1988.

Section 5A (50 upland lots) was approved and recorded on October 31, 1988, and sections 3A (21 upland lots) and 4A (10 upland lots) were approved on June 27, 1989, and recorded on June 29, 1989. Defendant takes no exception to these facts, provided that it is understood that approval refers to approval both by York County and the Corps.

Plaintiff maintains that wetland lots in sections 5B, 4B, and 3B could not be developed and sold until plaintiff prevailed in its case over whether or not the Corps had jurisdiction over these wetlands.

### 6. *Plaintiff's suit in the Claims Court*

Plaintiff filed its complaint on November 2, 1990, seeking to recover just compensation and damages for the alleged temporary regulatory taking of its property in sections 3, 4, and 5 from October 8, 1986, the date on which the Corps issued the Cease and Desist Order, to December 19, 1989, the date on which the decision of the United States Court of Appeals for the Fourth Circuit became final. The issues of, first, whether plaintiff's claim is ripe and whether the character of the Corps action constitutes a taking and, second, whether plaintiff suffered the loss of all viable use of its property were briefed and argued serially. After completion of briefing and argument, plaintiff filed a motion for leave to amend its complaint on August 28, 1992. In its proposed amended complaint, plain-

tiff pleads in the alternative: (1) It has suffered a temporary taking by being denied all economically viable use of Sections 3, 4, and 5 of its property from October 8, 1986, until December 19, 1989, the date on which the order of the Fourth Circuit was final and beyond appeal; (2) plaintiff has suffered a temporary taking by being denied all economically viable use of sections 3, 4, and 5 from October 8, 1986, until October 31, 1988, the date on which plaintiff obtained access to its upland lots in sections 3, 4, and 5 and by suffering a severe and substantial diminution in value of its land from October 31, 1988, until December 19, 1989; (3) plaintiff has suffered a temporary taking by being denied all economically viable use of sections 3, 4, and 5 from October 8, 1986, until October 31, 1988, when it gained access to its upland lots, even if no severe and substantial diminution of value is found by the court after that time; and (4) plaintiff has suffered a temporary taking from October 8, 1986, until October 31, 1988, or such other period as the court may find, because the prohibition of construction, development and sale of plaintiff's property in sections 3, 4, and 5 constituted a preservation and protection of privately owned property for the public benefit, for which plaintiff alleges it is entitled to just compensation.

## DISCUSSION

### I. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine dispute about a material fact exists if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in

dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 322, 324, 106 S.Ct. at 2553, 2553.

To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:

[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). The court must be satisfied that no genuine issues of material fact are present even if the parties file cross-motions, *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

In resolving cross-motions for summary judgment, the court cannot weigh the evidence and determine the truth of the matter. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2510. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554 (quoted in *Avia Group Int'l,* 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d, 1560, 1562 (Fed.Cir.1987)).

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir. 1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

■ Plaintiff alleges an unconstitutional taking. The Federal Circuit has characterized such cases as "fact intensive," cautioning against "precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983); *see also Whitney Ben., Inc. v. United States,* 752 F.2d 1554, 1559–60 (Fed.Cir. 1985); *Skaw v. United States,* 740 F.2d 932, 939 (Fed.Cir.1984). Accordingly, the court has scrutinized the record to assure that trial could not be expected to change the result.

## II. *Taking analysis*

### 1. *Taking of all economically viable use*

■ In some instances a restriction on property use may effect a fifth amendment

taking if the regulation either does not "substantially advance legitimate state interests" or if it "denies an owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citing *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928)); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126, 106 S.Ct. 455, 458, 88 L.Ed.2d 419 (1985); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978).

Both parties focus on the economic impact of the regulation, rather than its purpose. The Supreme Court set forth in *Penn Central* the factors important in the determination of whether there has been a deprivation of the economically viable use of land involved in a regulatory taking claim:

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action....

438 U.S. at 124, 98 S.Ct. at 2659 (citations omitted); *see also Connolly v. Pension Ben. Guaranty Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986); *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 901 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

The court proceeds initially with an inquiry into the economic impact of the Cease and Desist Order. If the effect of the Cease and Desist Order was to deny plaintiff all economically viable use of its property, plaintiff would be entitled to compensation for a taking notwithstanding inquiry into the other factors outlined in *Penn Central*. *Lucas v. South Carolina Coast-*

*al Council*, — U.S. —, —, 112 S.Ct. 2886, 2983, 120 L.Ed.2d 798 (1992).[16] A temporary taking that denies an owner "all use of his property ... clearly requires compensation." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). Plaintiff correctly states that it must show that the Corps' issuance of the Cease and Desist Order denied plaintiff economically viable use of its property.

■ Defendant argues, as an initial matter, that because plaintiff failed to remain within the framework of the permitting process, plaintiff's claim is not ripe, and should be dismissed. Although it is indisputable that in order to state a claim for a permanent regulatory taking, plaintiff must have applied for and been denied a permit, *Riverside Bayview Homes*, 474 U.S. at 127, 106 S.Ct. at 459, "denial of a permit may not be essential to a temporary taking claim...." *Dufau v. United States*, 22 Cl.Ct. 156, 163 (1990), *aff'd*, 940 F.2d 677 (Fed.Cir.1991) (Table).

In resolving the liability issue in regulatory takings cases, the court must address the "nature and extent of the interference with rights in the parcel as a whole." *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987); *Deltona Corp v. United States*, 657 F.2d 1184, 1192 (Ct. Cl.1981); *Ciampitti v. United States*, 22 Cl.Ct. 310, 318 (1991). The Supreme Court noted in *Penn Central* that " '[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated...." 438 U.S. at 130, 98 S.Ct. at 2662.

The Court of Claims has resolved other section 404 takings cases by analyzing the economic impact on the plaintiffs in the context of returns from sales and development activity of the property as a whole

---

**16.** For a detailed discussion of this "categorical" takings analysis and its relationship to the *Penn* *Central* inquiry, see discussion of *Lucas, infra* pp. 1350–51.

prior to the denial of a permit. *Deltona,* 657 F.2d at 1192; *Jentgen v. United States,* 228 Ct.Cl. 527, 533, 657 F.2d 1210, 1213 (1981). Under both *Deltona* and *Jentgen,* even if there was interference with plaintiff's ability to use or develop wetlands property, so long as there are valuable economic rights remaining in the property as a whole, compensation must be denied.[17] "Factors such as the degree of continuity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others ... enter the calculus...." *Ciampitti,* 22 Cl. Ct. at 318.

Although it is usual in regulatory takings analysis to begin with an examination of what constitutes the parcel as a whole, the parties have submitted an extraordinary amount of evidence of economic activity related to the property in question to enable an assessment of the economic impact of the regulation on plaintiff's use of its property. The parties differ as to their interpretations of what would constitute the parcel as a whole, but they agree on the essential facts underlying such a determination. Rather than make a determination to the outset as a matter of law on what exactly constitutes the parcel as a whole, the court will examine the economic impact of the Cease and Desist Order on two of the three scenarios proposed by the parties. First, the economic use of the property which includes 5 sections of Tabb

Lakes—1, 2 (A and B), 3, 4, and 5—the alternative proposed by defendant, will be considered. Second, the court will examine the economic activity on sections 3 4, and 5, which plaintiff claims should be considered the parcel as a whole for the purposes of this threshold analysis of its claim.

### 2. *Sections 1, 2A and 2B, 3, 4, and 5*

The evidence reveals that a great deal of economic activity took place on these sections between October 8, 1986, and December 19, 1989, the period of the alleged temporary taking.[18] It is undisputed that during the period of the alleged temporary taking initially claimed by plaintiff, plaintiff closed on 127 lots—28 lots in 1986, for a total of $766,450.00 in gross sales; 43 lots in 1987, for gross sales of $1,189,-950.00; 3 lots in 1988, for $94,300.00; and gross sales of $1,864,350.00 in 1989, based on the closing of 53 lots prior to December 19 of that year. In addition, plaintiff received additional income beyond sales of lots during the period of the alleged temporary taking. Plaintiff received sewer tap fees for its construction and sale of a model home in 1989, rental income of approximately $1,600.00 per month from commercial parcels, and approximately $30,000.00 in income from the sale of sand excavated from the Tabb Lakes subdivision.[19]

Plaintiff disputes defendant's contention that the number of lot closings during the period of the alleged taking forms the basis for determining loss of economically viable

**17.** Plaintiff has relied substantially on *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153 (1990), *appeal docketed,* No. 91–5050 (Fed.Cir. Feb. 11, 1991), to support its theory on what constitutes the parcel as a whole. *Loveladies,* currently on appeal to the Federal Circuit, runs contrary to the established precedents of *Deltona* and *Jentgen.* In *Loveladies,* although the Claims Court denied summary judgment to the plaintiffs, it ruled on what constituted the parcel as a whole, excluding from its analysis all but 11.5 acres of the property originally purchased for development, because this originally purchased property was not in plaintiffs' possession at the time the complaint was filed.

**18.** Although defendant disputes the time period set out by plaintiff as the appropriate period for determination of a temporary taking, defendant has framed its argument on economically viable

use and assumes, *arguendo,* that plaintiff is correct about the period itself.

**19.** Defendant advances other arguments demonstrating that plaintiff not only did not suffer the loss of all economically viable use of its property, but actually saw additional profits on lots sold from the subdivision prior to the Cease and Desist Order. Plaintiff disputes the relevance of these contentions, since plaintiff maintains that lots sold and closed on prior to the institution of the order should not figure into the analysis of the all economically viable use standard. Defendant suggests that this issue need not be reached, since sufficient economic activity existed during the period of the alleged temporary taking to constitute economically viable use, which, in defendant's view, defeats plaintiff's claim.

use of plaintiff's property. However, plaintiff offers scant support for its contention that "[r]eceipt of income from closings and notes receivable, for lots which were sold prior to the October 8, 1986 Cease and Desist Order, is not relevant to the issue of denial of all economic use of the 'parcel as a whole.'" Plf's Br., filed June 29, 1992, at 15. Plaintiff posits that the takings analysis must proceed by reference to local law, which, plaintiff argues, demonstrates that a contract of sale conveys equitable title of a lot sold to the purchaser on the date of the sale. Hence, according to plaintiff, the closing date is immaterial.

Defendant maintains that plaintiff operates under a misapprehension of Virginia law as it relates to the doctrine of equitable conversion and the question of when a sale finally occurs. Assuming, *arguendo*, that Virginia property law should be adopted, as plaintiff suggests, defendant challenges plaintiff's position on equitable conversion. Defendant notes that in each case cited by plaintiff to support the proposition that plaintiff no longer really owned the land once a contract was signed and equitable title conveyed, all contingencies had been removed, and an action for specific performance would lie were the buyer to attempt to renege on its agreement to take possession of and pay for the property.

Based on *Sale v. Swann*, 138 Va. 198, 208, 120 S.E. 870 (1924), for example, plaintiff represents that execution of a contract for the sale of land alone is sufficient to constitute a sale. In *Sale* the parties signed a contract for sale of land to be closed by payment of a promissory note and cash in exchange for the deed. Although the date of the closing passed, it was by mutual agreement of the parties. The seller brought an action for specific performance against the buyer, and the buyer conceded that the seller was entitled to the relief requested. No contingencies remained as obstacles to clear title. The only issue remaining was whether the seller was entitled to interest. The court ultimately adopted the closing date on the contract as the relevant moment in time for determining how interest should accrue and how rent and profits should be charged

back to the seller of the property to the buyer. In both *Sale* and *Carmichael v. Snyder*, 209 Va. 451, 164 S.E.2d 703 (1968), also cited by plaintiff, it was not until the closing date had passed that the court invoked equity to determine that the sale of land must go forth. As the court in *Christian v. Cabell*, 63 Va. (22 Grat.) 82 (1872), noted, it is important

> to ascertain the period at which the purchaser is to be regarded as the owner. He certainly must be so considered from the date of the bargain, where the vendor is in no default, and is prepared to convey a clear title. But if, according to the cases, a court of equity will not compel the purchaser to accept a title which the vendor cannot make out to be clearly good and free from incumbrance, how is the purchaser to be regarded as the owner till these objects are effected, and the vendor is prepared to make the title according to the contract....

63 Va. at 105.

Defendant points to several contingencies that amount to conditions precedent to a completed sale. Language from plaintiff's own sales contracts provides terms outlining that settlement shall not take place until "base stone is laid on a road contiguous to the subject lot"; "recordation of subdivision plat"; "the ability to obtain a building permit from York County"; the passing of a "grace period of 30 days"; "as soon thereafter as title can be examined and papers prepared allowing a reasonable time to correct any defects reported by title examiner"; and "Vendor to record utility easements prior to closing." These conditions were not mere formalities. The failure to satisfy any one of these conditions likely would have terminated the contract.

Defendant also emphasizes that plaintiff did not book a contract as a sale until the sale was closed. In the case of lot sales to individuals or entities not partners in plaintiff's venture, a sale was booked at closing when 75 percent of the money due was received; the remaining amount would be booked as an account receivable. In lot sales to shareholders, the sale was booked

**1348**

only after the house was constructed on the lot built and sold by the shareholder and the money received. Plaintiff did not report lot sales on its federal income tax returns until sales were closed.

The undisputed evidence supports a finding that the total gross sales of more than $3,900,000.00, which occurred during the period of the alleged taking on sections 1, 2A and 2B, 3, 4, and 5, is more than sufficient to demonstrate that plaintiff was not deprived of all economically viable use of its property during that period. Sales closed during that time are to be considered part of the economic impact analysis which must be performed in order to ascertain whether a taking occurred during the time period alleged by plaintiff.[20] Thus, if the parcel as a whole were to consist of these five sections, plaintiff could not demonstrate loss of all economically viable use.

### 3. Sections 3, 4, and 5

Arguing that the parcel as a whole should consist only of sections 3, 4, and 5, plaintiff contends that it was deprived of all economically viable use of sections 3, 4, and 5 during the period of the alleged taking. Plaintiff primarily relies on the affidavit of its appraiser, Robert P. Rist. Mr. Rist states:

I was subsequently requested to express my professional opinion as to whether or not any reasonable economic viable use existed for *all of the property owned by Tabb Lakes, Ltd. on October 8, 1986* as a direct result of the Cease and Desist Order issued by the U.S. Army Corps of Engineers on October 8, 1986. As stated ... it is my professional opinion that if all of the property owned by Tabb Lakes, Ltd. on October 8, 1986 is included in the "parcel as a whole" there was no economic viable use of this property on October 8, 1986 as a direct result of the Cease and Desist Order issued by

the U.S. Army Corps of Engineers on that date.

Affidavit of Robert P. Rist, June 22, 1992, ¶ 5(*l*)(iii) (emphasis in original) (the "Second Rist Affidavit").

Mr. Rist evidences the same misapprehension under which plaintiff operates with respect to its claim. First, when Mr. Rist speaks of "all property owned by Tabb Lakes, Ltd.", he is referring only to property in sections 3, 4, and 5. He thus maintains that the remainder of the property should not be considered in the analysis of all economically viable use, because sales contracts had been executed on lots in sections 1, 2A, and 2B. However, since under the law of the Commonwealth of Virginia, closing on a sale, not the sale itself, is the critical event, the premise for this assertion is unsound.

Second, even assuming, *arguendo*, that Mr. Rist is correct in his assumption on the legal definition of "ownership," his opinion is not helpful to plaintiff. Mr. Rist states that he was requested to render an opinion on the existence of "reasonable economic" use for plaintiff's property, presumably property in sections 3, 4, and 5. "Reasonable economic" use is not the applicable standard. Based on plaintiff's oral argument, it appears that plaintiff and Mr. Rist construe the term "reasonable economic" use to mean reasonably "profitable" use. Plaintiff made the point during oral argument that there was no economically viable use of sections 3, 4, and 5, because no one would buy all of the property in those sections in order to develop it. The notion of using "all" of the property, as if all economically viable use will rise or fall based on the failure to find economic use for each and every lot in each and every section, is not the applicable standard. The Second Rist Affidavit echoes the argument in emphasizing *"all of the property owned by Tabb Lakes, Ltd. on October 8, 1986,"*

---

**20.** The court does not consider defendant's argument for piercing the corporate veil and attributing still additional income to partners and shareholders of plaintiff who received additional fees for activities from brokering deals in property on behalf of plaintiff to performing legal work on behalf of the other shareholders.

While this argument is meritorious, it is unnecessary to reach the conclusion that the corporate veil should be pierced, because the economic activity within the four corners of the subdivision itself undermines plaintiff's argument that it was deprived of all economically viable use of its property.

thereby indicating that his opinion was rendered based on "all" of the property. Second Rist Aff. *id.* (emphasis in original).

Mr. Rist does not state that all economically viable use was taken during the period of the alleged taking. Rather, he states that there was "no economic viable use of this property on *October 8, 1986 ....*" Second Rist Aff. *id.* (emphasis added). At oral argument plaintiff postulated that a taking for even one day is a taking, and that the date of the taking occurred, naturally, on the first day of the Cease and Desist Order. Although this proposition seems valid in the abstract, it is not germane to the facts of this case. Plaintiff and Mr. Rist adopt the view that if a regulation was in effect for 3 years and 2 months, as in the instant case, and no economically viable use of property could be had on the first day of the regulation, a taking has occurred and the liability analysis goes no further. If, hypothetically, a regulation that was in effect for 3 years and 2 months stopped use of property for only one day, although extensive economic activity was carried out later on, plaintiff could not contend seriously that a taking had occurred. Plaintiff seemed to advance a similar argument when its counsel reiterated at oral argument that no sales were made on sections 3, 4, and 5 for the first 2 years of the alleged temporary taking. Plaintiff cannot be permitted to select out of the period of the alleged temporary taking another discrete period on which to base an argument that it lost all economically viable use.

Mr. Rist's affidavits fail to establish plaintiff's entitlement to partial summary judgment on liability or to interpose a genuine issue of material fact in opposition to defendant's motion. Plaintiff complains that defendant has not submitted a counter-affidavit. Although "the court may not simply accept a party's statement that a fact is challenged....," *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984), to the extent that Mr. Rist avers to any facts that must be challenged, defendant refutes the underpinnings of his affidavits with defendant's own elucidation of the facts as they appear elsewhere in the record.

Plaintiff contends as one of the primary reasons that its land was taken is that plaintiff was denied access to its property during the period of the alleged taking. This is patently untrue. Defendant correctly asserts:

Despite argument of plaintiff's counsel to the contrary, the documentary evidence indicates that *at least as of October 15, 1987,* the Corps *allowed Tabb Lakes access to its upland property through adjacent wetlands for both roads and utilities within the road beds and road easements,* and also that Tabb Lakes continued to fill and construct in wetlands. On October 15, 1987, the District reiterated to Spencer its previous advice that Tabb Lakes could proceed with roadcrossings previously authorized under nationwide permits (Gardenville Drive, Heather Haven, and the intersection of Thos. Hundley and Bridge Wood Rd.). On October 28, 1987 Assistant U.S. Attorney Kane reiterated to [Mr.] Nageotte [plaintiff's attorney] that *three road crossings previously authorized were exempted from discretionary authority and that Tabb Lakes could proceed.*

Def's Br., filed Sept. 11, 1992, at 7 n. 5 (citations omitted; emphasis in original).

In examining what actually took place vis-a-vis the sale of lots in sections 3, 4, and 5 during the period of the alleged taking as initially posed by plaintiff, a total of 53 lots was sold and closed on in plaintiff's subdivision during the period of the alleged taking. Two were sold in section 3A, for a gross sale of $70,900.00; 4 were sold in section 4A, for a total of $144,600.00; and 47 in section 5A, for $682,050.00. Apparently, plaintiff theorizes that since a developer would not buy all of the property in sections 3, 4, and 5—because sections 3B, 4B, and 5B could not be developed—plaintiff lost all economically viable use. The standard plaintiff is arguing is not "all economically viable use," but rather some version of "economically viable use of 'all'" in the same way that the term "all"

appears to have been used by Mr. Rist. The standard advocated by plaintiff is neither appropriate nor legally cognizable.[21]

In *Lucas v. South Carolina Coastal Council,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court addressed the question of whether a state's interest in preventing beachfront erosion under its police power would enable the state to prevent a homeowner from constructing beachfront homes on land that he had purchased prior to the promulgation of a regulation prohibiting such construction. The Court determined that plaintiff could not be denied compensation for a taking merely because the state might have the police power to prevent such construction. According to the Court, two instances occur in which regulatory action would be "compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas,* — U.S. at —, 112 S.Ct. at 2893. The first category of regulation is one where the owner is compelled to suffer a physical "invasion" of his property. *Id.; see also Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). The second category receiving categorical treatment by the Court is where a regulation "denies all economically beneficial or productive use of land." *Lucas,* — U.S. at —, 112 S.Ct. at 2893 (citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)); *see also Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981).

In a footnote to its opinion, the *Lucas* Court addressed the problem arising from the all economically viable use standard:

> Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole. . . .

— U.S. at — n. 7, 112 S.Ct. at 2894 n. 7.

The Court also suggested that although a property owner may not be entitled to categorical treatment in a takings analysis, the owner might nevertheless prevail when the value of its property had been substantially diminished. In taking issue with Justice Stevens' dissent in *Lucas,* the Court wrote:

> JUSTICE STEVENS criticizes the "deprivation of all economically beneficial use" rule as "wholly arbitrary", in that "[the] landowner whose property is diminished in value 95% recovers nothing," while the landowner who suffers a complete elimination of value "recovers the land's full value." This analysis errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation. Such an owner might not be able to claim the benefit of our categorical formulation, but, as we have acknowledged time and again, "[t]he economic impact of the reg-

---

21. Defendant points out that Mr. Rist's earlier affidavit using "before" and "after" models based on the issuance of the Cease and Desist Order, demonstrate that in both instances parcels 3, 4, and 5 would be profitable. Although defendant need not demonstrate profitability, and that standard would not be appropriate as the basis for deciding the existence of a taking, profitability may be a consideration in any eco-nomic analysis. The court does not address the validity of Mr. Rist's methodology for the "before" and "after" models, because the parties disagree on fundamental interpretation of the First Affidavit of Robert P. Rist dated Apr. 23, 1992. The court nevertheless is able to analyze the evidence under the all economically viable use standard by referring only to lot sales on which the parties agree.

ulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations" are keenly relevant to takings analysis generally. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124[, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631] (1978). It is true that in at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations. — U.S. at — n. 8, 112 S.Ct. at 2895 n. 8 (citation omitted).

■ Thus, *Lucas* appears to allow the proposition that a plaintiff need not suffer total deprivation of economic value in order to have suffered a taking. In the absence of a categorical taking, the Court reaffirmed the necessity for a traditional factual inquiry into the character of the government action and its economic impact on plaintiff. In other words, in taking stock of the economic impact of a regulation, if the regulation has deprived a property owner of all economically viable use of its property, the inquiry need proceed no further. If less than a deprivation of all economically viable use is found, a court is to consider the other factors enunciated in *Penn Central.*

After argument on the parties' motions and after *Lucas* was issued, this court requested the parties to submit a short brief advising of their opinions on the applicability of that decision. In its order of August 19, 1992, the court stated that based on the briefs and evidence of record, it was prepared to find that the economic activity carried out by plaintiff during the three years of the alleged temporary taking defeated plaintiff's claim that it had lost all economically viable use during that period. As such, the court noted that plaintiff's takings claim would not warrant "categori-

cal treatment" under the takings analysis articulated in *Lucas.* The court directed the parties to comment on whether the case was nevertheless amenable to summary judgment in light of footnote 8 of the majority opinion, which at least implied that a landowner who does not suffer total deprivation of economically viable use may still be entitled to recovery when his deprivation is "one step short of complete." *Lucas,* — U.S. at — n. 8, 112 S.Ct. at 2895 n. 8.

In its post-argument brief intended to discuss *Lucas,* plaintiff took exception with the court's statement that the economic activity during the three-year period of the Cease and Desist Order thwarted plaintiff's claim that it had lost all economically viable use. Plaintiff argued that "[n]o economic activity could occur in sections 3, 4, and 5 until after October 31, 1988 when the section 5A plat was recorded and no lots closed in sections 3, 4, and 5 before January 1989, more than two years after the Cease and Desist Order was issued...." Plf's Br., filed Sept. 8, 1992, at 1–2. The gist of this brief, taken together with plaintiff's companion motion to amend its complaint, is that plaintiff would ask for summary judgment as to a taking during the first two years of the Cease and Desist Order, during the period from October 8, 1986, to October 31, 1988, but that summary judgment as to the final 13 months should be denied because of material facts that plaintiff claims are in dispute. Plaintiff cites three examples of the facts that, in its view, preclude summary judgment for either party as to the last 13 months of the alleged temporary taking:

(1) Whether the sale and closing of 54 lots was economically viable; i.e. profitable and even if profitable whether the "economic impact" on Tabb Lakes and interference with Tabb Lakes "distinct investment backed expectations" requires compensation under the non-categorical analysis of *Penn Central Transportation v. New York City*, 438 U.S. 104[, 98 S.Ct. 2646, 57 L.Ed.2d 631] (1978)....

(2) Whether the "economic impact" of the sale and closing of 54 lots of the 219

lots in Sections 3, 4 and 5 in the third-year of the taking, a 75% diminution in value in the third year and a 92.6% diminution in value over the three years of the temporary taking is ... (1) an impact that requires compensation; or (2) interfered with Tabb Lakes distinct investment backed expectations.

(3) Whether, based on the disputed facts, the "character of the government action," the Cease and Desist Order together with the subsequent interference with use of the land is the equivalent of a physical invasion or otherwise requires compensation.

Plf's Br. filed Sept. 8, 1992, at 3–4 n. 3 (citations omitted).

Plaintiff's presentation of why it is entitled to partial summary judgment as to the first two years of the Cease and Desist Order, but that summary judgment disposition is inappropriate for the final 13 months, is convoluted. The facts that plaintiff maintains are in dispute actually are ultimate questions of law that can and should be resolved on summary judgment. For example, plaintiff puts forth as a disputed fact that were the Cease and Desist Order not in effect, "Tabb Lakes could have sold an average of 140 lots per year in Sections 3, 4 and 5....," based on its 1984 sales. Plf's Br., filed Aug. 28, 1992, at 9. Plaintiff further claims that based on its 1985 sales, it could have sold 119 lots in sections 3, 4, and 5. *Id.* Defendant correctly rejoins that not only are these figures speculative, but they are in direct conflict with the appraisal provided by plaintiff's own appraiser, Mr. Rist, who projected sales of approximately 70 lots per year in his before/after appraisal in his expert report.

Defendant's response to the court's request for briefing on *Lucas* was entirely on point. Defendant states that *Lucas'* cautionary footnote 8 may provide for relief when a party's deprivation is "one step short of complete." In contrast to the damage to the hypothetical plaintiff in the *Lucas* footnote, defendant contends that any deprivation plaintiff suffered in the instant case is "*far* from 'one step short of complete.'" Def's Br., filed Aug. 28, 1992, at 2 (emphasis in original). Defendant notes that plaintiff was able to proceed with development and sale of upland lots within sections 3, 4, and 5 during the period of the alleged taking, and ultimately plaintiff was permitted to fill and complete the entire development of all sections as a residential subdivision, which was contemplated initially. Defendant argues that, as a matter of law, the facts proffered by plaintiff cannot support a finding under a *Penn Central* inquiry that plaintiff's reasonable investment-backed expectations were subject to any substantial interference.

Even if plaintiff's definition of what constituted the parcel as a whole were to prevail—sections 3, 4, and 5 alone—plaintiff cannot succeed. The undisputed facts demonstrate that during the approximate three-year period plaintiff had substantial economically beneficial use of this property. The total receipts from lot sales alone in sections 3, 4, and 5 were $1,898,350.00. If sales from sections 1, 2A, and 2B were added, as well, the total lot sales amount to $3,915,050.00. Although defendant notes that the court need not look at profits in order to satisfy a finding of economic viability, defendant points out that plaintiff has not suffered substantial deprivation; in fact, plaintiff's profits on lot sales in sections 3, 4, and 5 amounted to $1,101,526.00, or $20,399.00 per lot. In applying the same analysis to sections 1, 2A, and 2B, plaintiff made a profit of $963,164.00, or $13,194.00 per lot. The undisputed facts of record support a finding that any losses suffered by plaintiff could amount to no more than a mere diminution in value, which the Supreme Court consistently has rejected as the basis for a compensable taking.[22]

### 4. *Character of government action/extraordinary delay*

"[T]here are many laws and government operations which have an injurious effect on, or even destroy, the value of property

---

**22.** For this reason it is unnecessary to examine the economic impact of the alleged taking by adding to the calculus other commercial property owned by plaintiff.

but are not considered takings." *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). "One must look to the character and extent of any interference with property rights whenever a taking claim is asserted." *Sun Oil Company v. United States*, 215 Ct.Cl. 716, 769, 572 F.2d 786, 818 (1978). Even if plaintiff has sustained economic losses, the "proof of damage alone will not necessarily prove a taking...." *Yazel v. United States*, 118 Ct.Cl. 59, 72, 93 F.Supp. 1000, 1003 (1950) (cited in *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 485–86, 657 F.2d 1184, 1190 (1981)). In evaluating the reasonableness of the issuance of the Cease and Desist Order and the permitting process attendant thereto, the key factor that the court must analyze is whether "extraordinary delay" in the governmental decision-making process gives rise to a temporary taking. *Agins*, 447 U.S. at 263 n. 9, 100 S.Ct. at 2143 n. 9; *see also First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). "[A]bsent extraordinary delay," in the governmental permitting or decision-making process, mere diminution in value will not, as a matter of law, rise to the level of a taking. *Agins, id.*

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court held that the requirement that a party obtain a permit before filling wetlands did not in any sense constitute a taking of property. "Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." 474 U.S. at 127, 106 S.Ct. at 459. Although it has been noted that a permit may not be a requirement for a temporary taking, *Dufau*, 22 Cl.Ct. at 163, *Riverside Bayview* does stand for the proposition that the mere requirement that a party participate in the permit application process does not itself provide a basis for compensation.

In *Dufau* the Claims Court addressed the takings claims of plaintiffs who had brought a suit for restrictions placed on their filling and development of wetlands within the jurisdiction of the Corps of Engineers. While *Riverside Bayview* addressed the reasonableness of requiring a permit application, the focus of *Dufau* was the time attendant in securing a permit. In *Dufau* plaintiffs alleged that the Corps had effected a temporary taking of their land by their delay in processing plaintiffs' section 404 application.[23] The court ruled that the 16–month period during which the permit application was processed did not constitute extraordinary delay. 22 Cl.Ct. at 163. The mitigation process, ongoing during much of this period, consumed a large portion of the processing time that was alleged to have been unreasonable. The court further found that the record did not support plaintiffs' contentions that the Government had acted in bad faith, or in a way to cause an extraordinary delay. *Id.* at 164. Finally, plaintiffs' own failure to undertake activities that might have shortened the application delay were found to have contributed to the delay in the permitting process. *Id.*

Defendant made the initial argument that plaintiff's claim was not ripe in that plaintiff had not pursued the permit application process to completion and that, therefore, no federal agency determination was made on plaintiff's plan for construction and development. Due to the unusual nature of the Corps' assertion of jurisdiction in this case, the court declines to address the ripeness issue. To hold plaintiff to completion on a permit application process when plaintiff had been informed that jurisdiction did not lie with the Corps would be unwise.

Assuming that a temporary taking could occur absent a formal agency decision on a permit application, plaintiff still is unable to demonstrate that the period of time during which plaintiff was unable to proceed with construction on its property constituted extraordinary delay. At the most this

---

**23.** Plaintiffs in *Dufau* also asserted a claim for a permanent taking based on the Corps' failure to identify which 70 acres of a 112–acre tract were wetlands, thus precluding them from developing any of the land.

period of time is "analogous to 'the case of normal delay in obtaining building permits, changes in zoning ordinances, variances, and the like' which do not give rise to a taking in the constitutional sense." *See Dufau*, 22 Cl.Ct. at 163 (quoting *First English*, 482 U.S. at 321, 107 S.Ct. at 2389).

It is undisputed that neither plaintiff, nor any of its agents, contacted the Corps prior to commencing development of plaintiff's property in order to seek a jurisdictional determination. Nor did plaintiff seek a formal jurisdictional determination during the ten-month period following its application for a permit following issuance of the Cease and Desist Order. In tracing the history of plaintiff's development activity, the record reveals that plaintiff began development almost 12 years after the Corps' interim regulations governing redefining "navigable waters" were issued. Pre-application consultation procedures are set forth in 33 C.F.R. § 325.1(b), and a formal jurisdictional determination can be found under 33 C.F.R. § 325.9, neither of which were utilized by plaintiff. Given the availability of these procedures, plaintiff could have mitigated its own damage and "should have ascertained for ... [itself]" whether its development activities were in line with federal environmental regulations. *Dufau*, 22 Cl.Ct. at 159.

The court does not find that the period of time spent in resolving plaintiff's dispute with the Corps over access to its property constituted unreasonable delay. The record demonstrates unequivocally that the Corps and plaintiff engaged early on in mitigation negotiations, which contributed in part to plaintiff's being allowed access to its upland lots. The record does not reflect that the Corps acted in bad faith. Plaintiff is unable to overcome the strong presumption that government officials carry out their duties in good faith. *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954).

Plaintiff has argued that the delay was unreasonable, hence extraordinary, because jurisdiction over plaintiff's land never lay with the Corps. In fact, ample evidence substantiates that the Corps' assertion of jurisdiction, although ultimately unsuccessful, was reasonable under the circumstances. The Corps' assertion of jurisdiction over the wetlands on plaintiff's property was based upon a good-faith belief that the wetlands were within its jurisdiction. The wetlands at issue were a habitat for a large number of creatures identified in Tables 6, 7, 8, and 9 of the draft environmental report provided to plaintiff by its own consultant. The United States Fish and Wildlife Service also provided a listing of 16 species of migratory birds which had been identified on the property during two separate site visits. The Corps' jurisdictional determination, which was completed after the filing of the pre-enforcement challenge by plaintiff, was based exclusively on migratory bird use. It did not allege or exclude jurisdiction based on any other use. Nothing appears of record to characterize as extraordinary the assertion of jurisdiction so that any delay would be transformed into extraordinary delay. That plaintiff successfully challenged the Corps' jurisdiction renders the initial assertion of jurisdiction neither unreasonable nor extraordinary.

### 5. *Court of Claims precedent*

Although plaintiff now argues that a grant of summary judgment would be inappropriate for any party as to the final 13 months of the alleged taking, at least one case addresses similar facts in which a grant of summary judgment was deemed appropriate. In *Jentgen v. United States*, 228 Ct.Cl. 527, 657 F.2d 1210 (1981), plaintiff sought compensation for a fifth amendment taking when the Army Corps of Engineers refused to grant a permit to allow plaintiff to go forward with his original plans to develop 80 of the approximately 100 acres he had purchased for residential development. Those 80 acres were subject to the Corps' jurisdiction pursuant to section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (1976),[24] and Section 404 of the Federal

---

**24.** Section 10 required a permit from the Army Corps of Engineers to the extent that "any ob-

struction" is created in the "navigable waters of the United States."

Water Pollution Control Act Amendments, 33 U.S.C. § 1344 (1976).[25] After plaintiff had submitted applications for development permits, under both acts, proposing that 60 acres be developed and 20 acres left in a natural state, plaintiff was informed that his permit applications had been denied. Plaintiff however, was offered modified permits that would have entitled him to develop 20 of the 80 acres covered by the applications. Together with the other 20 acres not subject to the Corps' jurisdiction, plaintiff would have been able to develop approximately 40 percent of the land that he had purchased for residential development. Plaintiff declined the modified permits entitling him to develop 20 of the 60 acres he had proposed. He then filed suit in the Court of Claims seeking just compensation as a result of the Corps' refusal to allow him to proceed with his development activities.

Employing the standards set out by the Supreme Court in *Penn Central*, the Court of Claims ruled that while the economic impact of the regulation was relevant in determining whether a taking had occurred, the effect of the regulations on plaintiff's property amounted to no more than a diminution in the value of the property. *Jentgen*, 228 Ct.Cl. at 532, 533–34, 657 F.2d at 1213–14. Plaintiff's alternative argument that he had suffered a taking because he was prohibited from putting his property to its "highest and best economic use," *id.* at 533, 657 F.2d at 1213, was considered to be without merit. The court found this argument unpersuasive as it was merely "another way of saying that there has been some diminution in the value of the property, rather than the complete destruction of all economically viable uses." *Id.* at 534, 657 F.2d at 1213.

As in *Jentgen* plaintiff in this case was permitted initially to develop certain portions of the property that it owned, while others were erroneously declared subject to the jurisdiction of the Corps. Subsequently, plaintiff was permitted additional access to its land, and like plaintiff in *Jentgen*,

participated in mitigation discussions, eventually developing a significant portion of its property. Despite only being permitted to develop 25 percent of its property, plaintiff in *Jentgen* was held not to have suffered a taking. Plaintiff in this case also bases a taking on its being unable to develop all of its land consistent with its plans. No evidence supports the statements of plaintiff's counsel that plaintiff would have been able to develop all of the 219 plots in sections 3, 4, and 5, instead of the 53 that were developed. Even if counsel's scenario were true, plaintiff has not suffered a constitutional taking. A total deprivation of economic use did not occur during the three-year period, nor did a substantial or severe diminution in value, which might be compensable. Instead, plaintiff enjoyed substantial income and substantial profits from its ongoing development activities that occurred even during the period of the Cease and Desist Order. Moreover, although plaintiff might be entitled to relief were it able to demonstrate extraordinary delay in the permitting process, coupled with a diminution in value, nothing in the record suggests that the government action in this case led to extraordinary delay.

III. *Plaintiff's two-year temporary takings claim and motion to amend*

 Plaintiff claims that it suffered a temporary taking of all economically viable use during the first two years of the Cease and Desist Order. This issue is addressed in the context of plaintiff's recent motion to amend its original complaint. The Supreme Court in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), set forth criteria for determining whether a motion for leave to amend under Fed. R.Civ.P. 15 should be granted. The grant or denial of an opportunity to amend pleadings is within the sound discretion of the trial court. Leave to amend should be given freely in the absence of any apparent or declared reason, such as undue delay, re-

---

**25.** The title "Federal Water Pollution Control Act" is used interchangeably with the "Clean Water Act" or "CWA."

peated failure to cure deficiencies by amendments previously allowed, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the proposed amendment. 371 U.S. at 182, 83 S.Ct. at 230; *see also Mitsui Foods, Inc. v. United States,* 867 F.2d 1401, 1403–04 (Fed.Cir.1989); *Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 666 (Fed.Cir.1986). In *Mitsui Foods* the Federal Circuit elaborated that "the *apparent* futility" of a proposed amendment can be a basis for denying leave to amend. 867 F.2d at 1404 (emphasis in original).

Allowing plaintiff to amend its complaint to reflect a cause of action for a temporary taking over a two-year period would be futile. As a matter of law, given the record in the instant case, no such taking could have occurred.

Plaintiff states that its reasonable investment backed expectations in lot sales were diminished "at least 100% during the first two years [of the Cease and Desist Order] and 75% during the third year." Plf's Br., filed Aug. 28, 1992, at 10. These contentions distort reality and illustrate the danger which inheres in the interpretation advocated by plaintiff of what constitutes reasonable investment backed expectations. As to plaintiff's contention that during the first two years of the Cease and Desist Order 100 percent of its reasonable investment backed expectations were thwarted, plaintiff omits the fact that during this two-year period alone, plaintiff executed contracts of sale on 37 separate lots within sections 3, 4, and 5.[26]

Defendant accurately represents the consequences of gerrymandering out of the three-year Cease and Desist Order period, a lesser two-year period that plaintiff now wishes to claim should constitute a temporary taking. The receipts of sales from lots in sections 3, 4, and 5, which resulted of development activity during the period

of the Cease and Desist Order, even during the first two years, would suddenly disappear from the calculus of the economic activity that occurred during the taking period. In other words, plaintiff would have the benefit of being able to execute contracts for sales on lots in the sections alleged to have been taken, yet would have the court hold that its reasonable investment backed expectations were thwarted 100 percent because there were no sales closed and booked during those periods.

It is undisputed that activity culminating in sales that occurred after the first two years of the Cease and Desist Order was ongoing during the first two years. As defendant argues, even if plaintiff were allowed to select a two-year period for the temporary taking, the fact that the receipts of sales would be outside what defendant refers to as the "window of scrutiny," Def's Br. filed Sept. 11, 1992, at 7, would not negate that fact that plaintiff was carrying on development activity during that time frame. For example, as of June 30, 1988, sewer taps and main sewer lines had been installed. Additional development materials had been placed outside the limits of road crossings. On a site visit in July 28, 1988, the Corps noted that additional unpermitted wetlands development had been performed. As another example, work on Lakes One and Two, plaintiff's stormwater detention ponds serving all sections of the subdivision, was ongoing throughout the proposed new period of the temporary taking.

The Supreme Court decisions do not allow an analysis of economic impact and reasonable investment backed expectations to be so circumscribed as to ignore sales receipts for property developed and sold during the first two years of the Cease and Desist Order, for which sales were closed and booked afterward. The Supreme Court's strict takings analysis would be diluted by permitting plaintiff's deliberate

**26.** Plaintiff asserts that the date of sale should be the contract date and not the date of closing. Plaintiff has made this repeated assertion primarily to divest itself of the ownership of numerous pieces of property in other subdivision sections. Yet, despite plaintiff's contention that the contract date is the date of sale, plaintiff amazingly holds forth with the argument that 100 percent of its reasonable investment backed expectations were thwarted during the first two years of the Cease and Desist Order.

attempt to disassociate costs and expenses from receipts. Allowing plaintiff to "artificially segment the planning, acquisition, financing, development, and sales of lots within that Subdivision into but a fraction of the 'whole' cannot be supported, and the true economic impact cannot be properly analyzed." Def's Br., filed Sept. 11, 1992, at 6 n. 3.

Plaintiff seems to be trying to conform its case to the court's statements that it would look first to sales activity as an indicator of the level of economic activity carried on by plaintiff during the period of the alleged taking. This statement was not an invitation to attempt to distort the economic picture by segregating development activities which generated sales from the sales themselves. A great deal of sales activity took place on these parcels, whether by the execution of sales contracts during the period of the alleged taking or with respect to development activities that contributed to the ultimate sale of plaintiff's property.

## CONCLUSION

"[W]here it is quite clear what the truth is," *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944), and when a party has demonstrated "that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984), summary judgment is appropriate. Because of the substantial economic activity reflected in plaintiff's lot sales, even if the court found that the parcel as a whole were sections 3, 4, and 5, and the absence of any extraordinary delay in the governmental permitting process, defendant is entitled to summary judgment. Under either the categorical analysis of *Lucas* or the *ad-hoc* factual inquiry of *Penn Central*, plaintiff has failed to demonstrate that it is due just compensation under the fifth amendment.

For the foregoing reasons, plaintiff's motions to amend its complaint and for partial summary judgment are denied, defendant's cross-motion for summary judgment is granted, and the complaint shall be dismissed. The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.